## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| STATE OF MINNESOTA, by its Attorney General Keith Ellison, | |
| Plaintiff, | **CASE NO. _____** |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| EVAN AZURE, in his official capacity as CEO of Island Mountain Development Group, and | |
| GENO LEVALDO, in his official capacity as Chairman of Island Mountain Development Group. | |
| Defendants. | |

The State of Minnesota by and through its Attorney General Keith Ellison ("the State" or "the Attorney General") alleges the following:

1.     This is a civil law enforcement action brought by the Attorney General to stop predatory lending in Minnesota by online businesses controlled by Defendants. These lenders—doing business as Bright Lending, Target Cash Now, Green Trust Cash, operating under the Island Mountain Development Group and controlled by Defendants ("Defendants" or "the Defendant lenders")—have made thousands of online installment loans to consumers in Minnesota bearing interest rates between 474% and 795%. These loans are illegal under Minnesota usury laws.

2.     Defendants purport to shield themselves from responsibility for this illegality by citing the sovereign status of their owner, a federally recognized Indian tribe. They represent to consumers in Minnesota that the out-of-state status of the tribal owner and

operation of tribal law allows them to market and demand payment on usurious loans, avoid compliance with Minnesota law, and leave consumers with no redress or ability to assert legal rights in court. But the truth is that out-of-state businesses incorporated under the laws of other sovereigns must comply with Minnesota law when transacting with consumers in Minnesota. Simply put, those that do business in Minnesota cannot evade Minnesota laws by operating online or including contract provisions purporting to waive operation of Minnesota statutes. Defendants' loans are illegal and their representations about consumers' obligations and rights are misleading, abusive, and unfair.

3.     Defendants also claim that, even if their businesses are illegal, their tribal owner's sovereign status prevents them from being subject to legal process. But several rulings addressing this form of abusive online lending in recent years have confirmed otherwise: sovereign entities are subject to judicial injunctive authority even if they cannot be sued for monetary remedies. In accordance with that caselaw, this civil enforcement action fully accepts and respects the sovereign status of the Defendant lenders' tribal owner and seeks only prospective relief. The Attorney General seeks only to enforce federal and state laws, including usury prohibited by Minnesota's civil and criminal code, and to stop further violations and harm to financially distressed Minnesota consumers.

4.     This Court is well-situated to adjudicate this matter. In addition to state-law claims, the Attorney General brings claims under federal laws guarding against illegal and deceptive lending. Specifically, the Consumer Financial Protection Act (CFPA) prohibits misleading, abusive, and unfair practices and the Racketeer Influenced and Corrupt

Organizations Act (RICO) bans excessive usury. Moreover, to the extent this action is brought by one sovereign to safeguard its interests against legal violations by the business arm of another sovereign, federal courts have a "strong interest in providing a neutral forum for the peaceful resolution of disputes between domestic sovereigns." *Gingras v. Think Fin., Inc*., 922 F.3d 112, 124 (2d Cir. 2019).

## PARTIES

5.      Keith Ellison is the Attorney General of Minnesota and brings this action on behalf of the State of Minnesota and its residents to enforce Minnesota and federal laws, vindicate sovereign and quasi-sovereign interests, and remediate harm arising out of violations of those laws. He is authorized to do so by the Minnesota Constitution, *parens patriae* powers, Minn. Stat. ch. 8, and 12 U.S.C. § 5552.

6.      Evan Azure is Defendant in his official capacity as Chief Executive Officer (CEO) of the Fort Belknap Planning and Development Corporation dba Island Mountain Development Group ("IMDG"), which is described in paragraph 8 below. Mr. Azure resides in Billings, Montana. As CEO, he is responsible for deciding policies and establishing goals, strategies, plans, and policies for the IMDG and the corporations it manages. Mr. Azure has been CEO of the IMDG and managed the corporations identified herein since April 2023. His predecessors are Jarrett Azure and Terry Brockie.

7.      Defendant Geno LeValdo is Defendant in his official capacity as chairman of the IMDG board of directors. As chairman, he oversees and supervises Mr. Azure and decides policies for IMDG and the corporations it manages. The IMDG's board authorizes

all business conducted by the IMDG and the corporations identified herein. Mr LeValdo resides or works in Hays, Montana. He has held the position of chairman since at least January 2023. LeValdo's predecessor as chairman was Tracy Charles King.

8.     The IMDG is a for-profit corporation headquartered at 375 Lower White Cow Road in Hays, Montana. It is the sole manager of limited liability corporations that engage in the business of lending in Minnesota, including Aaniiih Nakoda Finance LLC dba Bright Lending ("Bright Lending"), Green Trust Cash LLC dba Green Trust Lending ("Green Trust Cash"), and Target Finance LLC dba Target Cash Now ("Target Cash Now"). According to Mr. Azure, the IMDG "performs or oversees and maintains control over the performance of all of [Bright Lending's] core business functions."

9.     Bright Lending, Green Trust Cash, and Target Cash Now are LLCs formed under the laws of and wholly owned by the Fort Belknap Indian Community (FBIC). The sole member of Bright Lending is GVA Holdings, LLC, which is under the control of the FBIC. The FBIC also has owned, operated, and/or managed other online businesses under the following trade names: Island Finance LLC dba White Hills Cash, Clear Water Lending, LLC dba Cash Fairy, West River Finance LLC dba West River Cash, Blue Thread Lending LLC, North Star Finance, LLC dba Northcash, Northern Plains Funding LLC dba Northern Plains Funding, and Riverbend Finance LLC dba Riverbend Cash.

10.     The IMDG, the FBIC, and the IMDG's officers and directors operate Bright Lending, Target Cash Now, and Green Trust Cash with a shared purpose to engage in business in Minnesota (and select other states), maintains a continuous structure of

management and personnel to operate the business, and have an institutional structure that is distinct from that inherent in the unlawful conduct that is the subject of this lawsuit. The IMDG, Bright Lending, Target Cash Now, and Green Trust Cash also contract with non-tribal debt collectors to engage in collection and payment demands from consumers.

11.     Messrs. Azure and LeValdo are named as Defendants in this matter in their official capacities responsible for managing the IMDG and its LLCs Bright Lending, Green Trust Cash, and Target Cash Now. They are in control of policy and make decisions for the IMDG, Bright Lending, Green Trust Cash, and Target Cash Now. They have final authority regarding such matters as CEO and chairman of the IMDG, respectively

## JURISDICTION AND VENUE

12.     The Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1337 because a claim is brought under federal law: the CFPA pursuant to 12 U.S.C §§ 5564(f) and 5552(a)(1) and RICO pursuant to 18 U.S.C. §§ 1962 and 1964.

13.     The Court has supplemental jurisdiction over claims brought under state law pursuant to 28 U.S.C. § 1367. The conduct underlying the state and federal law claims form the same case or controversy because the underlying conduct is substantially the same.

14.     Defendants transact or do business in this District and/or are found in this District and are thus subject to personal jurisdiction herein pursuant to 18 U.S.C. § 1965(b) and (d) and 12 U.S.C §§ 5552(a)(1) and 5564(f), in addition to Minnesota's long-arm statute, Minn. Stat. § 543.19.

15.     This Court may also enter a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 through 2202.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in and because Defendants do business in this District.

## GENERAL ALLEGATIONS

17.     Since territorial times and after statehood, the Minnesota Legislature has prohibited usury, making loans charging excessive interest void and providing liability for any person who makes or collects on such loans. While this general prohibition has always remained, the Legislature in more recent years enacted specialized usury limits and restrictions for persons and entities engaged "in the business of making loans" and provided for loan contracts that violate that law as void. It has also instituted special restrictions to guard against predatory "payday" and other small and short-term loans and prohibited attempts to evade the law through deceptive contractual provisions. These laws are described in section I below.

18.     Defendants ignore these laws and have in recent years made thousands of loans to consumers in Minnesota at interest rates exponentially higher than what is permitted. They do so while deceiving Minnesotans to believe the Defendant lenders are immune from Minnesota law because they are owned by a federally recognized Indian tribe. But even sovereign entities and their subsidiaries must comply with Minnesota and federal law when they transact business in Minnesota. Defendants thus falsely represent

that their loans are legal, not subject to Minnesota law, and require consumers to repay illegal principal and interest. As detailed below, Minnesota continues to be harmed by Defendants' practices and respectfully requests injunctive relief to prevent further harm and uphold Minnesota's laws.

## I.      MINNESOTA'S USURY LAWS

19.    Usury laws limit interest and other finance charges that lenders can exact on borrowers and are one of the most longstanding and basic forms of consumer protection in American law. Such laws are historically and deeply rooted in the policy and moral judgment of legislators that exploiting those with limited means through predatory money lending is both unjust and harmful to individual borrowers and society at large.

20.    Accordingly, the Minnesota Legislature since territorial times has maintained usury laws that prevent individuals and businesses from charging predatory interest. Such laws have long protected Minnesotans facing financial distress from being exploited or misled into taking out harmful credit products during times of need.

21.    A general usury limit has been long codified in chapter 334 of the Minnesota Statutes and caps annual interest at 8% for written contracts. Chapter 334 and Minnesota and federal banking laws, however, allow certain financial institutions to charge higher select rates subject to federal or state supervision and restrictions.

22.    Loans subject to chapter 334's general interest rate cap but that nonetheless charge rates exceeding 8% are void and have no legal effect by operation of section 334.03 and 334.05. The Minnesota Supreme Court has also long held that usurious contracts are

void as to the lender, who cannot collect principal or interest or assert other rights under illegal loan contracts.

23.     The Minnesota Legislature has also enacted special restrictions on so-called "payday" and similar forms of small-dollar, short-term credit. Such loans target consumers facing immediate financial need and pose higher risks for exploitative practices and default—risks that have only increased as the market has increasingly moved online.

24.     Specifically, Minnesota's "consumer small loan" statute (section 47.60) was enacted in 1995 and applies to individuals or entities that make unsecured consumer loans up to $350 and scheduled to be repaid in a single installment. The law requires such lenders both to be licensed or registered and to follow limits on interest or fees permitted under the statute. Minnesota's "short term loan" statute (section 47.601) was added in 2009 and has applied to individuals and entities that made consumer loans up to $1,000 and required payments within 60 days of more than 25% of the balance. The statute has prohibited certain contract terms that prevent consumers from asserting rights under Minnesota law and requires disclosures of fees, interest, and other information. Consumer-short-term lenders must file additional reports to the Department of Commerce. A consumer small loan or consumer short-term loan not in compliance with interest-rate limitations and licensing requirements is void.[1]

---

[1] The 2023 Minnesota Legislature amended these statutes to eliminate certain fees for consumer small loans and short-term loans. The amended statute allows applicable

(Footnote Continued on Next Page)

25.     Subdivision 5 of the consumer-short-term-loan law (section 47.601) provides that a loan "is deemed to take place in the State of Minnesota if the borrower is a Minnesota resident and the borrower completes the transaction, either personally or electronically, while physically located in the state of Minnesota." This coincides with general Minnesota caselaw holding that businesses that market and extend loans to consumers in Minnesota via the internet are subject to Minnesota laws.

26.     In addition to the consumer-short-term-loan law and consumer-small-loan law, Minnesota generally requires that businesses engaged "in the business of making loans" up to $100,000 and above the general usury cap of 8% hold a license from the Department of Commerce and abide by interest-rate caps of either 21.75% annual percentage rate[2] on the entire loan or 33% a year for the first $1,350 and 19% for the remainder. Any loan contract in violation of these requirements is void and the debtor is not obligated to pay any amounts owing. Carrying on a predatory lending business in violation of chapter 56 is also a gross misdemeanor under section 56.10.

27.     Minnesota has strong interests in these consumer protections. According to the American Community Survey, nearly 9% of Minnesotans in 2021 were living below

---

loans to charge up to 50% interest if they make an assessment that the consumer has the ability to repay or 36% interest if they do not. It also raised the threshold for consumer short-term loans from $1,000 to $1,300. 2023 MINN. LAWS ch. 57, art. 3.

[2] "Annual percentage rate" or "APR" is the yearly cost of borrowing calculated as a percentage of a loan's original principal. The rate includes interest charged on outstanding balances, origination fees, and other finance charges in the annualized calculation; thus, it is a more accurate reflection of the costs of borrowing than simply referring to a loan's annual "interest" rate, though the terms are often used interchangeably.

the poverty line, with nearly one third of Minnesotans that identify as American Indian/Alaska Native (31%) or Black/African American in poverty.[3] Minnesotans increasingly report difficulty paying for basic needs, including increasing costs for food, gas, and housing.[4] Usury laws provide basic protection from lenders that seek to exploit Minnesotans needing to pay for such basic needs. Loans with exorbitant interest frequently result in borrowers stuck in cycles of costly borrowing and "debt traps" that worsen their financial condition.[5]

28.     Minnesota law has also traditionally recognized the important public policy served by usury limits. Lending above the general usury rate without being subject to licensing restrictions is subject to criminal penalties under chapter 56. The Minnesota Supreme Court has also held that a lender charging rates exceeding 500% on "wage earners who are forced by necessitous circumstances … to borrow small sums of money" constitutes a public nuisance.

---

[3] Angela R. Fertig, *Minnesota Poverty Report 2022*, MINN. COMMUNITY ACTION P'SHIP & HUMPHREY SCHOOL OF PUBLIC AFFAIRS (Mar. 7, 2022); *People in Poverty in Minnesota*, Minn. Dep't of Health, https://data.web.health.state.mn.us/poverty_basic; John Creamer et al, *Poverty in the United States: 2021*, UNITED STATES CENSUS Bureau (Sep. 2021).

[4] Ben Horowitz & Alene Tchourumoff, *Higher Prices & Job Struggles: The Challenges Many Ninth District Households Face*, FEDERAL RESERVE BANK OF MINNEAPOLIS (Feb. 8, 2023).

[5] *Market Snapshot: Consumer Use of State Payday Loan Extended Payment Plans*, CONSUMER FINANCIAL PROTECTION BUREAU (2022).

29.     Accordingly, after the Minnesota Legislature's enactment of the short-term loan statute (section 47.601), the Attorney General brought numerous enforcement actions against illegal online small-dollar lenders that were violating Minnesota's laws.[6]

30.     In addition to voiding usurious loans and providing criminal penalties for unlawful usurious lending, the Minnesota Legislature has needed to expend public funds to pay for programs to make interest- and fee-free loans that refinance and "resolv[e]

---

[6] *State by Swanson v. Global Payday Loan, LLC*, No. 27-CV-10-6381 (Minn. 4th Dist. July 20, 2010) (default judgment ordered online lender and pay $100,000 and to cease lending or collecting on loans to Minnesota residents until it complied with Minnesota law); *State by Swanson v. Jelly Roll Financial, LLC*, No. 19HA-CV-10-1703 (Minn. 1st Dist. Oct. 7, 2010) (consent judgment required online lender to pay $15,000 and cease lending to Minnesota residents until it complied with Minnesota law); *State by Swanson v. Eastside Lenders, LLC*, No. 19HA-cv-10-1075 (Minn. 1st Dist. Nov. 17, 2010) (consent judgment required online lender to pay $50,000 and cease lending to Minnesota residents until it complied with Minnesota law); *State by Swanson v. Silverleaf Mgmt.*, No. 33-cv-11-305 (Minn. 10th Dist. Mar. 28, 2012) (consent judgment required online online lender to pay $46,000 and cease lending to and collecting on any outstanding loans from Minnesota residents until it complied with Minnesota law); *State by Swanson v. Upfront Payday, LLC*, No. 33-cv-11-306 (Minn. 10th Dist. Apr. 2, 2012) (consent Judgment required online lender to pay $21,500 and cease lending to and collecting from Minnesota residents until it complied with Minnesota law); *State by Swanson v. Flobridge Group, LLC*, No. 62-cv-11-7171 (Minn. 5th Dist. June 11, 2012) (consent judgment required online lender to pay $34,000 and cease lending to Minnesota residents until it complied with Minnesota law); *State by Swanson v. Sure Advance, LLC*, No. 27-CV-11-18350 (Minn. 5th Dist. Nov. 16, 2012) (consent decree required online lender to pay $760,000 and cease lending to and collecting from Minnesota residents until it complied with Minnesota law); *State by Swanson v. Integrity Advance, LLC*, No. 62-cv-11-7168 (Minn. 5th Dist. May 31, 2014) (findings of fact and conclusions of law ordering payment of $7,705,308 and enjoining online lender from lending to and collecting from Minnesota residents until it complied with Minnesota law); *State by Swanson v. CashCall, Inc.*, No. 27-cv-13-12740 (Minn. 4th Dist. Aug. 17, 2016); (consent judgment required online lender to pay $4,500,000 and cease lending to and collecting from Minnesota residents until it complied with Minnesota law).

consumer short-term loans carrying interest rates greater than 36 percent," including $150,000 in annual grants beginning in 2023, $200,000 in one-time funds in 2023, and $100,000 in one-time funds appropriated in 2018. *See* 2018 Minn. Laws ch. 94, art. 1, § 7; 2023 Minn. Laws ch. 57, art. I, § 2. These appropriations from Minnesota's public fisc are necessary to relieve Minnesota consumers from predatory and inescapable debt.

## II.      DEFENDANTS VIOLATE MINNESOTA'S USURY LAWS

31.     Messrs. Azure and LeValdo manage businesses through the IMDG as part of a scheme in which individuals and corporate entities falsely market and extend loans at exorbitant interest rates in violation of the above usury laws. These illegal business activities are directed at and harm financially distressed Minnesotans, undermine Minnesota's laws and lending businesses that comply with those laws, and impose other direct costs on Minnesota.

32.     Mr. Azure currently acts as CEO of the IMDG, which oversees and maintains control of corporations that market and extend short-term installment loans to Minnesota consumers at annual interest rates between 400 and 800%, or 50 to 100 times that allowed under chapter 334. Mr. Azure's predecessor is Terry Brockie, who was CEO of the IMDG from May 2016 through January 2023. Mr. Azure took over as CEO in April 2023.

33.     In his role as CEO, Mr. Azure is a controlling participant in a scheme with various corporations and individuals to make misrepresentations to Minnesotans, issue usurious loans that violate Minnesota's criminal laws, and extract unlawful payments from financially distressed Minnesota consumers.

12

34.     Mr. LeValdo also exercises control over the IMDG and its corporations as chairman of the IMDG's board of directors. Mr. LeValdo's predecessor as chairman of the IMDB is Tracy Charles King. In his role as chairman, Mr. LeValdo is a controlling participant in a scheme with various corporations and individuals to make misrepresentations to Minnesotans, issue usurious loans that violate Minnesota's criminal laws, and extract unlawful payments from financially distressed Minnesota consumers.

Bright Lending

35.     Since at least 2017, the IMDG has operated Bright Lending as an online lending business that markets and offers loans to Minnesota consumers at balances between $350 and $1,500, charging 400% to 700% interest.

36.     In 2020, the BBB issued a consumer alert stating that it "recognized a pattern of complaints regarding the lending services provided by Bright Lending" based on consumers "borrow[ing] but after making several payments, [only to later] discover they owe much more money than they borrowed."

37.     The Washington State Department of Financial Institutions ("Washington DFI") announced in 2018 that Bright Lending also was operating in that state and was "not licensed" and "not registered to conduct business in Washington State." The Washington DFI stated that a loan "made by an unlicensed entity to a person physically located in Washington State is uncollectible and unenforceable in Washington State."

38.     Defendants, doing business through Bright Lending, send hard-copy marketing materials to Minnesota consumers. For example, Defendants sent mailings to a Minnesota consumer in Saint Paul in February and March 2023:



39.     According to the Bright Lending website, consumers in Minnesota can visit the website to view the business's marketing, fill out an online application that includes identification of their Minnesota address and other personal information, and review and e-sign loan contracts online from their home in Minnesota. After receiving Defendants' approval, those Minnesota consumers receive an email confirmation from Bright Lending

and receive funds deposited into their bank account from Bright Lending. The funds are deposited "typically … as early as one business day."

40.     Defendants have not offered Bright Lending loans to residents of all states. In particular, Defendants do not market or make Bright Lending loans to consumers in Arkansas, Connecticut, Massachusetts, Montana, New York, Pennsylvania, Puerto Rico, Vermont, Virginia, West Virginia, and other American jurisdictions. Defendants, however, have chosen to do business and make Bright Lending loans in Minnesota.

41.     Bright Lending frequently collects payments from Minnesotans by withdrawing funds from their bank accounts. They also send emails (or have debt collectors send emails) demanding payments from Minnesotans on Bright Lending loans. Under the Bright Lending contract with one such debt collector, Defendants transmitted account information and borrowers' Minnesota address to the debt collector and directed the collector to collect on Minnesota borrowers' debts, which may include recommending collection suits and settling accounts with borrowers.

42.     Many Minnesota consumers have reported to the Attorney General, the BBB, and other authorities that Bright Lending-branded loans with egregiously high interest rates and taken out while they were located in Minnesota.  For example:

> a.   DB of Minneapolis reported that he took out an online loan from Bright Lending on September 1, 2020 for $800. He did not understand that he took out the loan and incurred the debt until after the loan was deemed executed by Bright Lending. Bright Lending charged DB 400% interest and informed him that it would take 22 payments of $200 each from his bank account, for a total of $4,400. DB already faced extreme levels of medical debt, and he feared the interest on the Bright Lending loan would drive him into bankruptcy.

b. JB of Sauk Rapids reported that she took out a loan from Bright Lending for $500 in 2020 but was charged extremely high interest and had to pay back $2,244 on the loan. She did not know about this usurious interest rate before taking out the loan. When she learned about the high interest rate, she unsuccessfully attempted to cancel the loan.

c. SB of Saint Paul reported that she took out a $500 loan from Bright Lending, made one payment, then was told that she owed another $700. When she was unable to access her account or understand how those charges accrued, she reported the issue to the BBB.

d. AC of Saint Paul reported that she took out a $350 loan from Bright Lending in 2019 but did not know the usurious interest payment schedule. She ended having ten payments of $89.99 automatically debited from her bank account before being told that she owed another 21 payments, at an interest rate of 650%. She was outraged when she learned about this interest rate and says that she never would have taken out the loan if she knew the rate.

e. NG of Circle Pines reported that she took out a $500 loan from Bright Lending in February 2020 and was told that she would need to make $136 payments every two weeks. After several months of payments totaling $900, she was told she still owed an additional $300. This surprised her, given that she had repaid nearly double the original balance in just a few months, so she tried to refer to her account and loan documents, but they were not made available to her by Bright Lending.

f. DH of Minneapolis reported that she was charged $1,374 in interest on a $650 loan she took out from Bright Lending in 2020.

g. EL of Saint Paul reported that she took out a $500 loan from Bright Lending in 2019 and, after paying back over $800, was told that she still owed more. She faced financial distress when she reported the loan and could not afford additional payments.

h. ML of Fridley is 71 years old and reported taking out a loan from Bright Lending in 2021 while attempting to purchase furniture in North Branch, misunderstanding Bright Lending to be affiliated with the furniture seller. She was signed up for a $750 loan before learning it was not affiliated with the seller, but when she attempted to cancel the loan she was told it was too late. Bright Lending charged ML nearly 700% on the loan, and she could not afford the payments.

16

i.   RL of Oakdale is 66 years old and reported that she took out a $700 loan from Bright Lending in 2019. At the time, she was retired and struggled to pay her regular living expenses. She visited Bright Lending's website and filled out an application, assuming the loan was legal. She was also led to believe she could avoid interest by paying off the loan early. After approval, Bright Lending deposited the funds into her bank account. She then learned that the loan carried over a 423% interest rate. After making payments totaling $423.52, she still owed over $909. She called Bright Lending from Minnesota and was told that she could not avoid interest by paying off the loan early. After RL complained to the BBB, Bright Lending discharged the remaining balance, though by then she had paid more than twice the principal. She found the experience "incredibly stressful." Bright Lending continues to send letters to her Minnesota home marketing additional loans.

j.   AM of Eagan reported that she took out a $1,000 loan from Bright Lending in 2022, but later learned that the interest rate was higher than allowed under Minnesota law. She repaid over $1,124.10 over several months and could not afford additional payments.

k.   SR of Minneapolis reported that he took out a $600 loan from Bright Lending that, after just a few months, increased its balance to $846 because of a 600% interest rate.

l.   TR of Carver reported that he took out a $1,250 loan from Bright Lending in 2022, then subsequently learned the loan was subject to a 499.99% interest rate. The payments deepened TR's financial hardship.

m.   CT of Aitkin reported that she took out a $500 loan from Bright Lending in 2020. After paying back the $500 principal balance, however, she learned she still owed another $250 due to the loan's extremely high interest rate.

n.   SY of Spring Lake Park reported that she had taken out a $550 loan from Bright Lending at 700% interest. She made payments for several months but could not pay down the balance.

o.   TR of Woodbury reported that she took out a $500 loan from Bright Lending in 2018 and then learned it carried a 700% interest rate. She struggled to repay this loan.

p.   CK of Faribault reported in 2021 facing circumstances in his life that had left him "desperate" and "scared." At this time, Bright Lending extended

him a $1,000 loan at 700% interest. He reports that this loan has left him far worse off because he is "drowning in th[e] interest rate."

q.  AB of New Prague reported in 2022 that she took out a Bright Lending loan for $450. The Covid-19 pandemic caused her additional financial setbacks, and she could not repay the high-cost loan. Bright Lending charged 675% interest and continued to demand payment. AB eventually turned to a debt settlement company to pay $708.28 for the loan. She was told by Bright Lending that "the loan agreement signed by [AB] is legally binding, and we have every right to expect payment as scheduled in the agreement."

r.  MD of Cokato reported that he took out a loan for $850 in 2023 from Bright Lending. He then learned that Bright Lending was charging him 700% interest on the loan, saying that he "did not realize what I agreed to until after I received the payment plan." He states, "I don't understand how this is legal," and he was confused whether the company legally operates in Minnesota. He tried to transfer the high-interest loan to a lower-interest credit card, but Bright Lending refused to take a credit card payment and he became delinquent on the loan.

s.  AG of Elko New Market reported in April 2023 that she took out a loan from Bright Lending but, when she tried to repay the loan, was told that her payment would not be accepted. As a result, she incurred a finance charge of $35 for each day the loan was not paid. She believes Bright Lending "is very crooked and should not be allowed" to continue making loans in Minnesota.

t.  CR of Minneapolis, who is over 60, reported that in April 2023 that she needed money to pay bills. Bright Lending offered her a "pre-approved loan for $1,200" and asked her to provide loan application information online. She immediately qualified for a $600 loan with $30/month payments. She then was emailed the loan agreement and printed it out, only to discover that her payments were $300 per month (not $30 per month) with a 700% interest rate. She never would have agreed to the loan at this amount. She believes she was "scammed" and "a victim of predatory lending from Bright Lending."

u.  MP of Fort Ripley reported in 2023 that a Bright Lending loan was falsely taken out in her name, which caused Bright Lending to take payments from her bank account every week even though she did not authorize the loan. She learned that Bright Lending was charging 700% interest on the loan. When she complained, Bright Lending communicated to her that

she is past due and that it is exempt from Minnesota law. She reported feeling that she had no options for escaping Bright Lending's predatory debt.

v.   HF of Anoka reported in 2022 that she received a Bright Lending loan for $1,000 and, after making four $207.68 payments, she still somehow owed $1,220.15. She also stated that Bright Lending took money from her bank account even though she never authorized it. She feels that the company is "draining my pocket."

w.   TR of Chaska reported in 2022 that they lost their job in August 2022 and needed assistance with loan forgiveness. They stated that Bright Lending was charging them 499.99% interest to finance a $1,250 loan, which made the total payment amount $6,023.18. Payments were due every two weeks.

x.   NG of Anoka reported in 2020 that she took out a Bright Lending loan of $500. Nine months later, Bright Lending was still charging her $136 every other week and stated that she still owed it over $300. NG also stated that Bright Lending told her it was charging her $5 per day in interest. She reported that when she tried to look up her loan documents, they were unavailable. She believes that "this company is scamming people and needs to be stopped."

43.   The payment structure for these Bright Lending loans requires that a minimum of 25% or more of the original principal balance be repaid within 60 days of the loan's origination.

44.   The Bright Lending loans all include provisions in the loan agreement telling consumers that Minnesota laws do not apply to the loan agreement:

**Governing Law.** The laws of the Tribe will govern this Agreement, without regard to the conflict of laws rules of any state or other jurisdiction. You agree to be bound by Tribal law, and in the event of a bona fide dispute between you and us, Tribal law shall exclusively apply to that dispute.

45.   Bright Lending loans include provisions in the agreements telling Minnesota consumers that they are "limited in the claims, if any you may be able to assert" against the lender and that the consumer must proceed under resolution procedures through the

company's complaint portal and any "decision of the Tribal Council" as to the complaint "shall be final." The loan agreement states in boldfaced, capital letters that the consumer has no right to sue for violating state or federal laws:

**NEITHER THE TRIBE NOR WE ARE SUBJECT TO SUIT OR SERVICE OF PROCESS IN ANY COURT OR ADMINISTRATIVE PROCEEDING. THE EXCLUSIVE MEANS OF DISPUTE RESOLUTION AVAILABLE TO YOU IS THIS BORROWER COMPLAINT RESOLUTION PROCEDURE.**

46.     Bright Lending loans also include provisions that provide for "late payment fee[s]" of 10% of the payment amount, which it can assess if the consumer does not make payment "within 5 business days" after it is due.

47.     When the Attorney General contacted IMDG regarding consumer complaints, Mr. Azure's predecessor (Mr. Brockie) would respond to the Attorney General and the consumer that "Minnesota law does not apply to Bright Lending." The CEO would further state that Bright Lending has "every right to expect payment as scheduled in the [loan] agreement." Since becoming CEO and chairman, respectively, neither Mr. Azure nor Mr. LeValdo has corrected these statements. Rather, the IMDG continues to respond to complaints on behalf of Bright Lending and express in communications that Bright Lending loans are legal, enforceable, and not subject to Minnesota law.

48.     The overall and continuing impact of illegal Bright Lending loans on Minnesota is significant. Just one debt collector that contracted with Bright Lending reported being referred 634 Bright Lending loans for Minnesota consumers that were in default between 2018 to 2022. At the direction of the Defendant lenders, the debt collector contacted Minnesota consumers and falsely told them that these Bright Lending loans were

legal and enforceable, causing the consumers to pay nearly $325,000 on the loans after default.

Target Cash Now

49.     Since 2015, Defendants have also conducted business as Target Cash Now. Defendants market and offer Target Cash Now loans to Minnesota consumers at between $500 to $1,000 and charge interest between 602% and 795% interest.

50.     According to the Target Cash Now website, the business offers "rapid funding" of loans and will "deliver" funds to Minnesota consumers within "the business day after your application has been processed and approved." It states that Minnesota consumers can access the company's website, fill out an online application that identifies their Minnesota address and other personal information, receive a call from Target Cash Now from Minnesota to verify the information, and, once their application is reviewed and approved, can e-sign loan documents from Minnesota. Target Cash Now also emails consumers in Minnesota that filled out loan applications demanding payments.

51.     Target Cash Now's website, however, states that it does not conduct business in all states. Defendants do not extend Target Cash Now loans to residents of Arkansas, Connecticut, the District of Columbia, Montana, North Carolina, New Jersey, New York, Pennsylvania, Virginia, and West Virginia. They elect, however, to do business and make Target Cash Now loans in Minnesota.

52.     In 2020, the BBB issued an alert stating that it "recognized a pattern of complaints from consumers regarding the lending services provided by Target Cash Now"

based on consumers "borrowing money from the business and having to pay back much more than they borrowed due to the interest rates attached to the loan."

53.     The 2018 announcement by the Washington DFI referenced above also stated that Target Cash Now was operating and "not licensed" and "not registered to conduct business in Washington State." It stated that a loan "made by an unlicensed entity," like Target Cash Now, "to a person physically located in Washington State is uncollectible and unenforceable in Washington State."

54.     Minnesota consumers have reported problems to the Attorney General, the BBB, and other authorities about Target Cash Now loans they took out while in Minnesota:

   a.  CW of Minneapolis reported that he took out a $400 loan from Target Cash Now in 2017. After he took out the loan, he learned that it carried a 700% interest rate. He ended up making payments totaling $700 before having to make a final payoff of $546.33.

   b.  CG of Shakopee reported in 2021 that she took out a $300 loan from Target Cash Now. She paid back more than $400 but reported that the interest accrued and she continued to owe money on the loan even after those payments.

   c.  HI of Minneapolis reported in 2021 that he took out a $1,200 loan from Target Cash Now that carried a 500% interest rate. He reported that he would have to pay $3,800 in interest over 10 months on the loan, with each monthly payment at $508. After paying over $2,000, Target Cash Now's continuing demand for repayment caused him great financial hardship.

   d.  JJ of Saint Paul reported in 2021 that he took out a $600 loan from Target Cash Now when he needed money during the Covid-19 pandemic. When he contacted the company a month later to inquire about paying off the loan in full, he was told he needed to pay $995 or face a ten-month repayment plan in which he would repay a total of $1,900.

   e.  VM of Saint Paul reported in 2021 that she took out a loan from Target Cash Now and repaid $700, which she thought accounted for the total

balance. However, she was told after paying this amount that she still owed $120 and that interest continued to accrue while she dealt with "financial restrictions" during the Covid-19 pandemic. Eventually, she began to receive calls from a debt collector and filed a complaint. Target Cash Now replied to her complaint that "the loan agreement signed by [VM] is legally binding…and we have every right to expect payment as scheduled in the agreement."

f.  CN of Maple Lake reported in 2016 that she needed money for to cover living expenses and took out a $700 loan from Target Cash Now. The high interest and repeated payment demands from Target Cash Now resulted in her repaying over $1,784 on the loan.

g.  SS of Bertha, who is 70 years old and receiving a fixed income, reported in 2020 that he took out a $1,200 loan from Target Cash Now to make necessary repairs to his home. He had trouble corresponding with the company by email and so instead spoke with the company over the phone. SS reports that he did not know that the interest and repayment amount got so high. He was eventually told he needed to repay nearly $2,000 to pay off the loan.

h.  TS of Brimson reported in 2020 that he took out a $375 loan from Target Cash Now but later learned of an extremely high interest rate that he did not believe was fair to charge or demand.

i.  RB of Saint Paul reported in 2014 that he took out a Target Cash Now loan for $800 but, after he took out the loan, learned that it carried a 900% interest rate. Facing dire financial distress, he filed for bankruptcy. Yet Target Cash Now's representatives told him that he owed them regardless of his bankruptcy discharge and made repeated collection calls to his home in Minnesota every day. Only after he complained to the BBB did the company stop pursuing the debt.

55.  The Target Cash Now loans require that a minimum of 25% or more of the original principal balance be repaid within 60 days of the loan's origination. For example, one set of loan documents for a Target Cash Now loan with an original principal of $900 required biweekly payments of $197.33, which amounts to $789.32 or 88% of the original principal due within 60 days after the loan was executed.

56.     Target Cash Now loans include provisions in the loan agreements telling

consumers that Minnesota laws do not apply to its loans:

**GOVERNING LAW.** The laws of the Tribe will govern this Agreement, without regard to the conflict of laws rules of any state or other jurisdiction. You agree to be bound by Tribal law, and in the event of a bona fide dispute between you and us, Tribal law shall exclusively apply to that dispute.

57.     Target Cash Now includes provisions in its loan agreements telling

Minnesota consumers that they must assert complaints through a complaint procedure

controlled by the lender's owner, the FBIC. The consumer must agree to a "borrower

complaint resolution procedure" that prevents them from filing an action in court:

**Neither the Tribe nor we are subject to suit or service of process in any court or administrative proceeding. The exclusive means of dispute resolution available to you is thIS Borrower Complaint Resolution Procedure.**

58.     Target Cash Now includes late-payment fees over 5% of each payment

amount in its loans. For example, one set of Target Cash Now loan documents included

provisions that provide for $35 in "late payment fees" for any payments 5 days after they

are due. All scheduled payments were for $197.33, making the late fees 17.7% of each

payment amount.

59.     When the Attorney General contacted the IMDG regarding complaints it

received from Minnesota consumers, Defendant Azure's predecessor (Mr. Brockie) would

respond on behalf of Target Cash Now by stating that "Minnesota law does not apply to

Target Cash Now." He further stated that loans made by Target Cash Now are "legally

binding" and that Target Cash Now has "every right to expect payment as scheduled in the

[loan] agreement." Since taking over as CEO and chairman, respectively, neither Mr.

Azure nor Mr. LeValdo has corrected these statements. The IMDG continues to express in communications from the corporations identified herein that the loans of the IMDG and related entities are legal, enforceable, and not subject to Minnesota law.

60.     Target Cash Now and/or its contracted debt collectors contacted consumers in Minnesota, sent emails to consumers in Minnesota, and directed other commercial acts into Minnesota. What's more, Target Cash Now's contract with one debt collector provided for Target Cash Now to place defaulted accounts with the collector (which identified borrowers' addresses in Minnesota). Target Cash Now directed the collector to "pursue diligent collection efforts" on those Minnesota borrowers, including to "make every effort to collect accounts prior to making recommendations to file suits on such accounts."

61.     In 2019, the Connecticut Commissioner of Banking ordered Target Cash Now to cease lending activity in violation of Connecticut consumer-lending laws.

62.     The overall impact of these illegal Target Cash Now loans on Minnesota is significant. One debt collector that contracted with Target Cash Now reported being referred 97 defaulted Target Cash Now loans taken out by Minnesota consumers between 2018 to 2022. At the direction of the Defendant lenders, these Minnesota consumers who were referred for collection to the collector and were falsely told that these Target Cash Now loans were legal and enforceable paid nearly $58,000 to the collector on the loans.

Green Trust Cash

63.     Defendants have conducted business as Green Trust Cash since at least 2012. Defendants marketed and offered Green Trust Cash loans to Minnesota consumers at

25

between $300 and $800 and charged interest between 471% and 841% interest. Green Trust Cash marketed its products as providing instant cash to individuals who need the money and cannot obtain credit from other lenders.

64.     Defendants, doing business as Green Trust Cash, completed loan transactions with Minnesota consumers over the internet while the consumers were physically located in Minnesota. In a typical transaction, the consumer would go to Green Trust Cash's website from Minnesota, fill out an application that identified their Minnesota address and bank account information, get approved by Green Trust Cash for the loan, accept the offer while in Minnesota, have funds deposited directly into their bank account by Green Trust Cash, and then receive notices in Minnesota to repay the loan. Green Trust Cash would often withdraw payments on the loan directly from the consumer's bank account.

65.     Defendants do not extend Green Trust Loans to all states. Defendants selected Minnesota as a state in which it would conduct business and make Green Trust Cash loans. Green Trust Cash does not lend to residents of Arkansas, Connecticut, Massachusetts, Montana, New York, Pennsylvania, Puerto Rico, Vermont, Virginia, West Virginia, American Samoa, and other American jurisdictions and groups of consumers.

66.     Minnesota consumers have reported to the Better Business Bureau, the Attorney General's Office, and other authorities about Green Trust Cash loans that they took out while in Minnesota:

        a.   NB of Andover reported that she took out a $450 installment loan from Green Trust Cash in 2018 after receiving marketing from the company via email stating that she was approved for a loan. After she received the loan, she was surprised to learn that she owed 21 payments of $138.39,

for a total of $2,455.72, and an interest rate of 700%. NB's bank account was overdrawn and she faced severe financial distress because of the loan.

b.  DS of New Ulm reported that he took out an installment loan from Green Trust Cash in 2017 and later learned that it carried an interest rate of 694%. When DS communicated that the loan should be cancelled because it was not legal, the company told her that they did not need to comply with Minnesota law.

c.  DCT of Golden Valley reported that he took out a $300 loan from Green Trust Cash in 2016 to cover rent. After making several payments totaling $716, he still owed $286. The loan carried an interest rate of 557%. When DC complained about these rates, Green Trust informed him that it did not need to comply with Minnesota law. Green Trust's collections caused DC extreme financial distress.

d.  DH of Willmar reported that he took out a $550 installment loan from Green Trust Cash because he was struggling financially, needed to meet his living expenses, and felt "desperate." When he took out the loan, Green Trust's website said that Minnesota was one of the states it did business in and DH believed the loan was legal. Green Trust deposited the $550 into his bank account in Minnesota. After repaying $765, DH could not reduce the balance on the loan due to the "terribly high interest rates." When the AGO contacted Green Trust Cash to assist, a representative told the AGO and DH that Minnesota law did not apply and that DH had to repay the loan.

e.  BJ of Moorhead reported that he took out a $350 loan from Green Trust Cash in 2016. After Green Trust Cash took out $130 and $112 payments from his bank account, BJ learned that only $10 of those payments went towards paying down the principal.

f.  JJ of Duluth reported that she took out a $350 loan from Green Trust Cash in 2016 that she later learned carried a 762% interest rate.

g.  DM of Olivia reported that he took out a $500 loan in 2019 from Green Trust Cash. After paying back $666.30 on the loan, however, he learned he still owed $522. He learned that he would need to pay $2,798 in total to pay off the loan based on the interest charged. When DM complained, Green Trust told him that they do not need to follow Minnesota law.

h.  CR of Minneapolis reported taking out a $300 loan from Green Trust Cash in 2016. After paying back $935, she asked to change bank accounts

for automatic debits, but the company prevented her from changing the account, resulting in substantial overdraft fees and distress.

i. TR of Woodbury reported that she took out a $800 loan from Green Trust Cash in 2018. After repaying $334, she learned that the principal balance had not been paid down due to the extremely high interest rate, causing her financial hardship.

j. YS of Bloomington reported that she took out a $650 loan from Green Trust Cash in 2018. After having payments withdrawn from her bank account for some time, she checked her balance and learned she owed $1,116. Eventually she was told that she would need to pay $3,910.62 to pay off the loan, which she learned carried an interest rate of nearly 700%.

k. TH of St. Charles reported in 2019 that she took out a $500 loan from Green Trust Cash when faced with financial distress. When she could not make payments, Green Trust Cash refused to give any extensions. She had to stop making payments but reported concern that she would be subjected to collection based on what she believed were illegal demands for repayment.

l. DC of New Ulm reported in 2017 that he took out a $300 loan from Green Trust Cash and later found out it carried a 694% interest rate. When DC contacted the company and expressed concerned about the loan's legality, Green Trust Cash emailed him to say the loan was legal and he had to repay it.

m. KA of Hill City reported in 2016 that he took out a small-dollar loan from Green Trust Cash and was told after taking it out that they would charge 880% APR. He reports that Green Trust called him at all times of the day in Minnesota.

67. The Green Trust Cash loans are for a maximum of $1,000 and require that a minimum of 25% or more of the original principal balance be repaid within 60 days of the loan's origination.

68. Green Trust Cash loans include provisions in the loan agreement telling consumers that Minnesota laws do not apply to the agreement:

GOVERNING LAW: The laws of the Tribe will govern this Loan Agreement, without regard to the laws of any state or other jurisdiction, including the conflict of laws rules of any state. You agree to be bound by Tribal law, and in the event of a bona fide dispute between you and us, Tribal law shall exclusively apply to such dispute.

69.     Green Trust Cash loans include provisions in the loan agreement telling consumers that they are "limited as to what claims, if any, you may be able to assert" against the lender. The consumer must agree to a "tribal dispute resolution procedure" that prevents them from filing an action in court:

THIS TRIBAL DISPUTE RESOLUTION PROCEDURE PROVISION MEANS THAT:

• YOUR RIGHT TO FILE SUIT AGAINST US FOR ANY CLAIM OR DISPUTE REGARDING THIS AGREEMENT IS LIMITED BY THIS PROVISION AND SOVEREIGN IMMUNITY.
• YOU ARE GIVING UP YOUR RIGHT TO HAVE A TRIAL BY JURY TO RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES.
• YOU ARE GIVING UP YOUR RIGHT TO HAVE A COURT RESOLVE ANY DISPUTE ALLEGED AGAINST US OR RELATED THIRD PARTIES; AND
• YOU ARE GIVING UP YOUR RIGHT TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY, AND/OR TO PARTICIPATE AS A MEMBER OF A CLASS OF CLAIMANTS, IN ANY LAWSUIT OR ARBITRATION FILED AGAINST US AND/OR RELATED THIRD PARTIES.

70.     One set of Green Trust Cash loan documents included provisions that provide for a "late charge" for payments "2 days or more late," which could apply to payments between $13 and $115 (or between 230% and 26% of the payment amount). Another set of loan documents provided for a 10% late fee for any payment 5 days late.

71.     Mr. Azure's predecessor Mr. Brockie would respond as CEO to the Attorney General's inquiries regarding the above consumers on behalf of Green Trust Cash by stating that "Minnesota law does not apply to Green Trust Cash, LLC." The CEO of the IMDG would further state that the loans made by Green Trust Cash are "legally binding" and that the IMDG has "every right to expect payment as scheduled in the [loan] agreement." Since taking over as CEO and chairman, respectively, neither Mr. Azure nor Mr. LeValdo has corrected these statements. The IMDG under Mr. Azure and Mr. Levaldo's control continues to express in communications from the corporations identified

herein that the loans of the IMDG and related entities are legal, enforceable, and not subject to Minnesota law.

72.     The overall impact of these illegal Green Trust Cash loans on Minnesota is significant. One debt collector that contracted with the IMDG and Green Trust Cash reported 327 Green Trust Cash loans taken out by Minnesota consumers and were in default from 2018 to 2022. Minnesota consumers who had accounts referred to the collector and were falsely told that these Green Trust Cash loans were legal and enforceable paid over $225,000 to the collector on those loans.

73.     According to statements made to the BBB, Defendants have ceased offering new loans under the name Green Trust Cash, but existing Green Trust Cash loans remain outstanding.

III.     **INJUNCTIVE RELIEF IS NECESSARY TO STOP ONGOING VIOLATIONS OF MINNESOTA LAW THAT HARM MINNESOTA.**

74.     In addition to Bright Lending, Target Cash Now, and Green Trust Cash, the IMDG and FBIC have used various other lender entities and business names to conduct illegal online lending, including Island Finance, LLC dba White Hills Cash; Clear Water Lending, LLC dba Cash Fairy; West River Finance LLC dba West River Cash; Blue Threat Lending, LLC; North Star Finance, LLC dba Northcash; Northern Plains Funding, LLC dba Northern Plains Funding; and Riverbend Finance, LLC dba Riverbend Cash. These entities are also identified by the Washington DFI as online lenders that "may be operating as an unlicensed online tribal payday lender."

75.     The Minnesota consumers that Defendants made illegal loans to were harmed, including by being subjected to payment demands and debt collection for exorbitant interest and being falsely compelled to repay loan balances that were, in truth, void and uncollectible under Minnesota law. Defendants have also made false and misleading statements to Minnesota consumers, including:

    a.   that Defendants had a legal right to collect payment on illegal and void loans, that the loans were enforceable, and that borrowers would be in default and subject to collection if they failed to pay; and

    b.   that their loans were "solely within the Tribe's jurisdiction, not any other state," that "Minnesota law does not apply to Green Trust Cash, LLC," and other like statements.

76.     Defendants' conduct and operations of the IMDG and its LLCS (Bright Lending, Target Cash Now, and Green Trust Cash) undermine Minnesota's sovereign interests in upholding its laws, preventing wrongful and harmful business conduct, protecting the economic health of state residents, ensuring a sound and fair marketplace for financially distressed consumers with diminished bargaining power, and preventing unfair competition against businesses that comply with Minnesota law.

77.     Defendants' conduct also has required the Attorney General's Office and the Department of Commerce to expend substantial resources responding to reports from consumers subjected to illegal loans. Both agencies are charged with the responsibility to assist Minnesota consumers and investigate potential legal violations and have needed to address and mediate complaints from consumers that took out illegal loans from Bright Lending, Target Cash Now, and Green Trust Cash.

78.     Also, loans issued by Defendants have and will continue to be addressed and remediated by State-funded grants to refinance and reconcile such debts with no-fee, no-interest loans. As described above, the 2018 Minnesota Legislature appropriated $100,000 to "assist individuals in reaching financial stability and resolving payday loans," including those issued by Defendants that are the subject of this action. In 2023, the Minnesota Legislature again appropriated $150,000 in annual funds to continue to "assist individuals" that have taken out usurious loans, including those issued by Defendants that are the subject of this action. These funds were granted to and administered by a nonprofit called Exodus Lending. *See* 2018 Minn. Laws. ch. 94, art. I, § 7; 2023 Minn. Laws ch. 57, art. I, § 2.

79.     The Legislature also appropriated one-time funds to Exodus Lending to "assist in the development of a character-based small dollar loan program" that would make loans to those facing financial instability in lieu of high-interest loans like those offered by Defendants. *See* 2023 Minn. Laws ch. 57, art. I, § 2.

80.     Attempts to evade usury laws to exploit consumers are not new. Predatory lenders have long attempted to employ various schemes and legal artifices to evade Minnesota's usury laws.

81.     One common avoidance scheme involves short-term lenders entering agreements with federally recognized Indian tribes whereby the tribe's status is used to claim that sovereign immunity prevents enforcement of state consumer-protection laws. Those who facilitate these schemes make statements in their marketing and

communications to consumers intending to make consumers believe that their state's laws do not apply.

82.     Defendants' statements that their loans are legal and that Minnesota laws do not apply are false. The U.S. Supreme Court has repeatedly recognized that tribal sovereign immunity does not prevent the substantive application of laws where tribal-related entities engage in off-reservation business activity that would otherwise be subject to state regulation.

83.     Nor can a person evade compliance with Minnesota law by including a fine-print provision in a consumer contract that state laws do not apply. Contractual devices in form contracts signed by consumers do not validate otherwise void loans made in violation of civil or criminal laws.

84.     For this reason, numerous circuit courts have recognized that short-term loans made by online and tribal-affiliated lenders are subject to state laws when the lender steps beyond its tribal boundaries and makes loans to consumers in that state.

85.     Thus, the substantive laws of Minnesota apply to tribal entities that do business in the State even if tribal entities are subject to sovereign immunity from suit in federal and state courts. But it is well-established—most notably in a 1908 U.S. Supreme Court decision in a case brought against the Minnesota Attorney General, *Ex Parte Young*, 209 U.S. 123 (1908)—that officials acting in control of a sovereign entity may be subject to civil suits *for injunctive relief* to prevent further or ongoing violations. The U.S. Supreme Court has in fact specifically held that, though money damages are not available, states

may seek *Ex Parte Young* relief against tribal officials who transact unlawful business outside of tribal lands.

86.     Accordingly, the Attorney General seeks injunctive relief to stop further illegal lending and false and misleading conduct by Defendants in Minnesota.

## COUNT I

### Unfair, Deceptive, and/or Abusive Acts or Practices in Violation of the Federal Consumer Financial Protection Act
### 12 U.S.C. §§ 5531 and 5536

87.     The Attorney General incorporates by reference paragraphs 1 through 86 of this Complaint.

88.     In enacting the Consumer Financial Protection Act (CFPA), Congress made it illegal for any "covered person" to engage in "any unfair, deceptive or abusive act or practice." 12 U.S.C. §§ 5531, 5536.

89.     Defendants are "covered persons" because they are "persons"—which includes both an "individual" or a "company, corporation, … or other entity"—that are "engaged in offering or providing a consumer financial product or service." 12 U.S.C. § 5481. Defendants, in their official capacity for the IMDG and the corporations identified herein, market and extend loans to Minnesota consumers.

90.     **Deceptiveness**. A representation, omission, or practice has been deemed deceptive when it misleads or is likely to mislead the consumer; the consumer's interpretation of the representation, omission, act, or practices is reasonable under the circumstances; and the misleading representation, omission, act or practice is material.

91.     Defendants engage in deceptive acts because:

a. Defendants represent that consumers have a legal obligation to repay loan amounts that in fact did not exist because the underlying loan contracts violate Minnesota law and thus are void *ab initio*, market their loans as legal credit products when they are not, falsely tell consumers that Minnesota law does not apply and outlaw their loans, send correspondence to Minnesota consumers demanding payment and claim that repayment demands are enforceable when they are not, originate ACH debit entries from consumer bank accounts on void loans, demand repayment on defaulted loans that are void, and fail to disclose to consumers that they had no legal obligation to pay the loan amounts because they were void under state law.

b. Consumers' interpretation of Defendants' misrepresentations—i.e., the false notion that Defendants' loans are valid and enforceable and that Minnesota law does not apply and outlaw the contracts—is reasonable because, among other circumstances related to the transactions, the interpretation is what is literally and explicitly stated by Defendants. Further, consumers are unlikely to know for certain that Minnesota law and U.S. Supreme Court precedent render Defendants' loans void or limit consumers' obligation to repay them, and thus consumers are unlikely to avoid paying illegal amounts to which Defendants and their business entities are not entitled.

c. The subject of the misleading statements—whether a loan is legal and a consumer must repay the debt—is material.

92.   **Unfairness**. An unfair act or practice under the CFPA is one that causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers and the substantial injury is not outweighed by benefits to consumers or to competition. 12 U.S.C. § 5531(c).

93.   Defendants' acts are unfair because, among other circumstances and facts alleged above, consumers are likely to be injured by the repayment of usurious interest and payments made on void loans, be forced to make choices between repaying Defendants' debts or competing daily necessities, and experience distress at the incursion of excessive interest and repayment demands. This harm is not reasonably avoidable because consumers

are unlikely to know for certain that Minnesota law and U.S. Supreme Court precedent render Defendants' loans void or limit consumers' obligation to repay them; consumers are thus unlikely to avoid paying illegal amounts to which Defendants and their business entities are not entitled. Nor is the substantially injury outweighed by benefits to consumers or competition—indeed, there is no benefit to usurious and predatory loans that harm financially distressed consumers and violate basic consumer-protection laws.

94.     **Abusiveness**. An abusive act or practice is one that either (1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service or (2) takes unreasonable advantage of a consumer's lack of understanding of the material risks, costs, or conditions of the product or service; a consumer's inability to protect their interests in selecting or using a consumer financial product or service; or a consumer's reasonable reliance on a covered person to act in the interests of the consumer. 12 U.S.C. § 5531(d).

95.     Defendants' actions are abusive because false statements about the validity of the loan and non-application of Minnesota law cause consumers to believe they must repay the loans and prevent them from understanding a key term or condition of the loan—i.e., their illegality and unenforceability under Minnesota law. Defendants' actions also take unreasonable advantage of consumers' lack of understanding of material risks. Consumers are unlikely to know that Minnesota law and U.S. Supreme Court precedent render Defendants' loans void or limit consumers' obligation to repay them, and thus consumers are unlikely to avoid paying illegal amounts to which Defendants and their

business entities are not entitled. Defendants take advantage of consumers' likely misunderstanding or confusion regarding the legality of the loans, inability to protect their interests in selecting such loans, and reasonable reliance on Defendants' statements.

96.     Messrs. Azure and LeValdo manage and control the IMDG, Bright Lending, Target Cash Now, and Green Trust Lending. They decided, adopted, or ratified the policies of the IMDG, Bright Lending, Target Cash Now, and Green Trust Lending related to the unlawful lending operations and deception outlined herein. They also conspired and agreed with the entities described herein and other persons to make the illegal loans and misrepresentations to Minnesota consumers and extract illegal payments from individuals in Minnesota.

97.     Defendants' violations are ongoing. Defendants continue to make new loans to Minnesota consumers, demand Minnesota consumers repay illegal and void loans, and engage in debt collection of illegal and void loans from Minnesota consumers. Minnesota and its residents have been and continue to be harmed by Defendants' unfair, deceptive, and/or abusive acts or practices.

98.     Because the business entities controlled by Defendants and identified herein are owned by federal recognized Indian tribes and subject to sovereign immunity, the Attorney General brings this action for declaratory and injunctive relief only—in order to secure effective prospective relief to stop continuing and future violations of the law.

99.     Before initiating this action, the Attorney General sent a complete copy of this Complaint and written notice describing this action to the Consumer Financial Protection Bureau in accordance with 12 U.S.C. § 5552(b)(1).

**COUNT II**
**RICO—Collection of Unlawful Debts**
**18 U.S.C. § 1962(c)**

100.    The Attorney General incorporates by reference paragraphs 1 through 86 of this Complaint.

101.    Congress enacted the Racketeer Influenced Corrupt Organizations Act (RICO) to combat racketeering and other illegal businesses transacted across states. Section 1962 of RICO provides liability based on either a "pattern of racketeering activity" or "collection of an unlawful debt":

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

102.    In separately targeting collection of "unlawful debts," Congress intended to address "the evils" of predatory lending and "loan sharking." *Durante Bros. & Sons v. Flushing Nat. Bank*, 755 F.2d 239, 250 (2d Cir. 1985). Congress defined an "unlawful debt" to be a debt incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

103.    Defendants are "persons" as defined by section 1961(3). Both as principals and acting in concert with each other and other persons and entities, the enterprise they

38

manage and control has repeatedly and continues to charge, demand payment, and collect on loans in Minnesota far more than twice the usury rate cap under Minnesota law.

104.    Defendants are "employed by or associated with" an "enterprise" that is engaged in interstate or foreign commerce" because they are managers and directors of the IMDG, Bright Lending, Target Cash Now, and Green Trust Cash. They operate these businesses and work with other individuals and entities—including nontribal debt collectors—towards a common and shared purpose, with continuity of structure and personnel, and as an ascertainable structure distinct from the predicate illegal activity that is the subject of this lawsuit. *See* 18 U.S.C. § 1961(3) (defining "enterprise"); *Handeen v. Lemaire*, 112 F.3d 1339, 1351 (8th Cir. 1997) (applying elements of section 1962(c)).

105.    The enterprise is engaged in and its activities affect interstate commerce. The IMDG, Bright lending, Target Cash Now, and Green Trust Cash, along with the Defendants that control those businesses, other individuals, and other entities (including nontribal debt collectors), operate out of the FBIC and transact their business across multiple states (including Minnesota).

106.    Section 1964(a) of RICO provides that federal district courts "shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders," including by "imposing reasonable restrictions on the future activities … of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise,

making due provision for the rights of innocent persons." Section 1964(c) of RICO further provides that any "person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court."

107.   Minnesota is an entity included in the definition of "person" under section 1961(3) that continues to be injured by Defendants' violating conduct. Such ongoing injury includes, additionally and alternatively:

- direct harm to Minnesota's sovereign interests in compliance with state law and a sound business marketplace, protection against unfair competition and harm to businesses that comply with the law, and harm to the ongoing economic health of state residents take out predatory loans;

- the expenditure of governmental resources by the Attorney General's Office and the Department of Commerce to investigate, respond to, and mediate complaints from consumers subject to payment demands and other collection on illegal debts,

- the expenditure of public funds necessary to purchase and remediate illegal loans made by Defendants to Minnesota consumers, and

- the undermining of the Legislature's funding of a "character-based small dollar loan program" for the benefit of Minnesota consumers and in lieu of high-interest loans like those offered by Defendants.

108.   Minnesota seeks permanent injunctive relief pursuant to section 1964 of RICO to prevent and restrain further direct harm to the above interests.

## COUNT III
### General Usury
### Minn. Stat. ch. 334

109.   The Attorney General incorporates by reference paragraphs 1 through 86 of this Complaint.

110.    Section 334.01 sets the general usury rate cap in Minnesota as 8% per annum on written loan contracts under $100,000. The rate cap under section 334.01 applies unless another rate applies for businesses supervised and regulated under Minnesota or federal law. *See, e.g.*, Minn. Stat. § 334.01, subd. 3 (contracts governed by ERISA), § 334.011 (business and agricultural loans), §§ 334.02 & 334.03 (exempting financial institutions and regulated lenders subject to section 47.59, section 48.196, sections 56.01-56.19, and federal banking supervision); § 47.59 (setting rates for certain state-regulated or -supervised financial institutions).

111.    Defendants have violated and continue to violate chapter 334 by charging and collecting on loans subject to the chapter with egregious annual interest rates ranging from 474% to 795%.

112.    Defendants are subject to the 8% usury rate under chapter 334 because they are not licensed, registered, or otherwise supervised and regulated by federal or Minnesota agencies.

113.    Under section 334.02 and 334.05, Defendants' loans were and are void *ab initio*. Minnesota consumers who were extended such loans have no obligation to repay the loan or be subject to collection.

114.    Messrs. Azure and LeValdo are liable for these violations in their official capacity in the management and control of the IMDG, Bright Lending, Target Cash Now, and Green Trust Cash. They decided, adopted, and/or ratified the policies of the IMDG, Bright Lending, Target Cash Now, and Green Trust Lending related to the unlawful lending

41

operations. They also conspired and agreed with the entities described herein to make the illegal loans and misrepresentations to Minnesota consumers and to extract illegal payments from individuals in Minnesota.

115.    These violations are ongoing: Defendants continue to make usurious new loans to Minnesota consumers, demand repayment from Minnesota consumers loans subject to usurious interest rates, and engage in debt collection from Minnesota consumers on illegal loans. Minnesota and its residents have been and continue to be harmed by Defendants' violations of chapter 334.

116.    The Attorney General is entitled to bring civil actions to enforce chapter 334 pursuant to Minn. Stat. § 8.31 and common law *parens patriae* authority.

117.    Because the business entities controlled by Defendants and identified herein are owned by federal recognized Indian tribes and subject to sovereign immunity, the Attorney General brings this action for declaratory and injunctive relief only—in order to secure effective prospective relief to stop continuing and future violations of the law.

**COUNT IV**
**Usury for Lending Businesses**
**Minn. Stat. §§ 56.01-56.19**

118.    The Attorney General incorporates by reference paragraphs 1 through 86 of this Complaint.

119.    Chapter 56 of the Minnesota Statutes provides that "no person shall engage in the business of making loans" with an initial balance of less than $100,000 and "charge, contract for, or receive" interest that is more than what is allowed if the person was not a

"licensee under this chapter." Minn. Stat. § 56.01. This prohibition applies "to any person who, by any device, or pretense, shall charge, contract for, or receive greater interest … than is authorized by [chapter 56]." Minn. Stat. § 56.18.

120.   In other words, lending businesses that wish to make loans above the 8% general usury cap under chapter 334 (and are not regulated by Minnesota or federal authorities as a bank, savings association, trust company, licensed pawnbroker, or credit union) both must obtain a lending license from the Department of Commerce. Section 56.131 then allows those regulated lenders to issue loans at higher but still limited interest rates set forth under Minn. Stat. § 47.59 (which is either an overall rate of 27.75% or a graduated rate of 33% for principal under $1,350 and 19% for amounts above $1,350). If the lender is not licensed, loans they issue above the general usury cap are illegal and void under section 56.19 (in addition to chapter 334).

121.   The Attorney General is Minnesota's chief law enforcement officer and authorized to bring civil actions to enforce chapter 56's usury prohibition for lending businesses under section 8.31 and his *parens patriae* authority. *See State by Swanson v. Minnesota Sch. of Bus., Inc.*, 899 N.W.2d 467 (Minn. 2017) (holding that Attorney General may enforce and pursue injunctive relief for violations of chapter 56).[7]

---

[7] The Minnesota Department of Commerce has authority to bring administrative actions as licensor for regulated lenders. *See* Minn. Stat. §§ 56.21, 45.027. But the Attorney General has independent and concurrent authority to enforce chapter 56 as the State's chief law officer. *See State ex rel. Hatch v. Am. Fam. Mut. Ins. Co.*, 609 N.W.2d 1, 4 (Minn. Ct. App. 2000).

122.    Defendants have violated and continue to violate chapter 56 by engaging in the business of making loans while charging and collecting on loans with a principal balance under $100,000, at interest rates well above the general usury cap and without a lending license.

123.    Defendants are not licensed under chapter 56, nor are they banks, savings associations, trust companies, licensed pawnbrokers, credit unions, or other entities doing business under and as permitted by Minnesota or federal law. Even if Defendants did hold a lending license, they would still violate section 56.131's usury limit for lending businesses because the interest rates on their loans are exponentially higher than those permitted under section 47.59.

124.    As a result of these violations, all loans issued under Bright Lending, Target Cash Now, Green Trust Cash, and any other entity controlled or managed by Defendants and the IMDG to consumers in Minnesota are void. Pursuant to section 56.19, borrowers on such loans are under no obligation to pay any amounts demanded related to those loans.

125.    Defendants are liable for these violations in their official capacity in management and control of the IMDG, Bright Lending, Target Cash Now, and Green Trust Lending. They decided, adopted, and/or ratified the policies of the IMDG, Bright Lending, Target Cash Now, and Green Trust Lending related to the unlawful lending operations outlined herein. They also conspired and agreed with the entities described herein to make the illegal loans and misrepresentations to Minnesota consumers and extract illegal payments from individuals in Minnesota.

126.   These violations are ongoing: Defendants continue to make new loans under $100,000 to Minnesota consumers at egregious and blatantly unlawful interest rates, demand repayment from Minnesota consumers on the loans, and engage in debt collection from Minnesota consumers on the loans. Minnesota and its residents have been and continue to be harmed by Defendants' violations of chapter 56.

127.   Because the business entities controlled by Defendants and identified herein are owned by federal recognized Indian tribes and subject to sovereign immunity, the Attorney General brings this action for declaratory and injunctive relief only—in order to secure effective prospective relief to stop continuing and future violations of the law.

**COUNT V**
**Violation of Consumer Short-Term Loan Statute**
**Minn. Stat. §§ 47.601**

128.   The Attorney General incorporates by reference paragraphs 1 through 86 of this Complaint.

129.   Section 47.601 guards against the worst practices in high-risk lending by setting protections from individuals and entities in the business of making "consumer short-term loans." The law prohibits contracts that purport to displace or render inapplicable Minnesota law, requires that lenders provide complete copies of lending contracts and disclose necessary information about the loan, requires compliance with Minnesota debt-collection laws, and requires special reporting to the Department of Commerce.

130.   Section 47.601, subdivision 6, renders void any consumer short-term loan issued by a consumer short-term lender who is not properly licensed, includes contract

terms prohibited under the statute, or charges interest or fees in violation of limits set forth under Minn. Stat. § 47.59, subd. 6 (capping charges for loans made by regulated financial institutions), and Minn. Stat. § 47.60 (setting charges for consumer small-loan lenders).

131.   The Attorney General is authorized to bring civil actions to enforce section 47.601, section 8.31, and *parens patriae* authority. *See*, *e.g.,* Minn. Stat. § 47.601, subd. 7.

132.   Loans made by Defendants have initial principal balances between $300 and $1,250 and are made to borrowers while in Minnesota (including but not limited to the borrowers identified above) for personal, family, or household purposes. The repayment schedules for these loans require high weekly or biweekly payments from the borrower equal to at least 25% of the initial principal balance within 60 days of the loan's origination. Thus, many if not most of the loans made by Defendants and the corporations they manage and control have an original principal balance of $1,000 or less and are subject to section 47.601.

133.   Defendants are each "an individual or entity engaged in the business of making or arranging consumer short-term loans" and are not "a state of federally chartered bank, savings bank, or credit union" and are subject to section 47.601.

134.   Defendants' loans are also not transactions made under chapter 325J or loans where, in the event of default on the loan, the sole recourse for recovery of the amount owed, other than a lawsuit for damages for the debt, is to proceed against physical goods pledged by the borrower as collateral for the loan.

135.    Defendants' loans with initial principal balances under $1,000 (or loans that will be made on or after January 1, 2024, and up to $1,300) and made to Minnesota residents while in Minnesota violate section 47.601 in the following ways:

  a. Defendants require borrowers to sign a contract with "a provision selecting a law other than Minnesota law under which the contract is construed or enforced" in violation of subdivision 2(a)(1);

  b. Defendants require borrowers to sign a contract with "a provision choosing a forum for dispute resolution other than the state of Minnesota" in violation of subdivision 2(a)(2); and

  c. Defendants do not file reports with the Department of Commerce for each calendar year that documents amounts collected, average APRs, number of borrowers, number of borrowers with 5 to 20 or more loans, and the number of loans charged off, in violation of subdivision 4.

136.    Pursuant to section 47.601, subdivision 6(b), the loans identified herein that violate section 47.601 are void because:

  a. Defendants did not "obtain[] an applicable license from the commissioner" (as detailed in count IV above),

  b. Defendants violate subdivision 2 related to impermissible contract provisions as detailed in paragraph 135(a) and (b) above, and

  c. Defendants impose late fees in violation of section 47.59, subd. 6(a)(4) (capping late fees at 5% of the payment amount or $9.36, whichever is greater).

137.    Defendants are liable for these violations in their official capacity in management and control of the IMDG, Bright Lending, Target Cash Now, and Green Trust Lending. They decided, adopted, or ratified the policies of the IMDG, Bright Lending, Target Cash Now, and Green Trust Lending related to the unlawful lending operations outlined herein. They also conspired and agreed with the persons and entities described

herein to make the illegal loans and misrepresentations to Minnesota consumers and extract illegal payments from individuals in Minnesota.

138.    These violations are ongoing: Defendants continue to make new consumer short-term loans to consumers in Minnesota and demand repayment and engage in debt collection on loans subject to these violations. Minnesota and its residents have been and continue to be harmed by Defendants' violations of section 47.601.

139.    Because the business entities controlled by Defendants and identified herein are owned by federal recognized Indian tribes and subject to sovereign immunity, the Attorney General brings this action for declaratory and injunctive relief only—in order to secure effective prospective relief to stop continuing and future violations of the law.

**COUNT VI**
**Prevention of Consumer Fraud Act**
**Minn. Stat. § 325F.69-.70**

140.    The Attorney General incorporates by reference paragraphs 1 through 86 of this Complaint.

141.    Minn. Stat. § 325F.69 (2022) provides that the "act, use, or employment" by "any person" of "any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice" that is made "with the intent that others rely thereon in connection with the sale of any merchandise" is "enjoinable as provided in section 325F.70. The representation is actionable "whether or not any person has in fact been misled, deceived, or damaged thereby."

142.   As of 2023, section 325F.59 of the CFA also prohibits "unfair or unconscionable practice[s]." 2023 Minn. Laws. ch. 57, art. IV, § 16.

143.   The term "merchandise" under section 325F.69 includes "services" and "loans." Minn. Stat. § 325F.68, subd. 2.

144.   Section 325F.70 provides that "the attorney general … may institute a civil action in the name of the state in the district court for an injunction prohibiting any violation" of the CFA. It further provides that the court, "upon proper proof that such defendant has engaged in a practice made enjoinable" by the CFA "may enjoin the future commission of such practice." The statutes clarifies that it "shall be no defense to such an action that the state may have adequate remedies at law."

145.   Defendants violated and are violating the CFA through their control and operation of business entities identified herein that represent (expressly or by implication) that consumers have a legal obligation to repay loan amounts that in fact did not exist because the loans are void *ab initio* under Minnesota law. Defendants, through their control and operation of the business entities identified herein, have marketed their loans as legal credit products, sent correspondence to Minnesota consumers demanding payment, originated ACH debit entries from consumer bank accounts, conducted debt collection on Minnesota consumers, and demand repayment on defaulted loans.

146.   Defendants, through their control and operation of the business entities identified here, also have failed to disclose that consumers had no legal obligation to pay the loan amounts because they were void under state law. Consumers were and are unlikely

49

to know that Minnesota laws and U.S. Supreme Court precedent render Defendants' loans void or limited consumers' obligation to repay.

147.    The representations were misleading and made with the intent that others rely thereon in connection with the sale of loans to Minnesota consumers. Representations concerning the legal obligation of the consumer to repay or not repay are material terms or conditions meant to induce the borrower to believe the loans are legal, to induce consumers to make payments they are not obligated to make, and to prevent consumers from asserting rights under Minnesota law. These practices are unfair and misleading.

148.    The Attorney General is authorized to bring civil actions to enforce the CFA under section 325F.70, section 8.31, and *parens patriae* authority.

149.    Defendants are liable for these violations in their official capacity in management and control of the IMDG, Bright Lending, Target Cash Now, and Green Trust Lending. They decided, adopted, or ratified the policies of the IMDG, Bright Lending, Target Cash Now, and Green Trust Lending related to the unlawful lending operations and deception outlined herein. They also conspired and agreed with the entities described herein to make the illegal loans and misrepresentations to Minnesota consumers and extract illegal payments from individuals in Minnesota.

150.    These violations are ongoing: Defendants continue to market and sell new consumer loans to consumers in Minnesota and demand repayment and engage in debt collection on loans subject to these violations. Minnesota and its residents have been and continue to be harmed by Defendants' violations of the CFA.

151.    Because the business entities controlled by Defendants and identified herein are owned by federal recognized Indian tribes and subject to sovereign immunity, the Attorney General brings this action for declaratory and injunctive relief only—in order to secure effective prospective relief to stop continuing and future violations of the law.

**COUNT VII**
**Uniform Deceptive Trade Practices Act**
**Minn. Stat. §§ 325D.44-.45**

152.    The Attorney General re-alleges paragraphs 1 through 86 of this Complaint.

153.    Minn. Stat. § 325D.44-.45 (2022) (the Uniform Deceptive Trade Practices Act or "UDTPA") provides that a "person …. engages in a deceptive trade practice" when "in the course of business, vocation, or occupation," they: "cause[] likelihood of confusion or of misunderstanding as to the … approval[] or certification of goods or services," "represent[] that goods or services have … characteristics … that they do not have," or "engage[] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Minn. Stat. § 325D.44, subd. 1(2), (5), (13).  Deceptive practices under section 325D.44 may be enjoined and "proof of monetary damage, loss of profits, or intent to deceive is not required."

154.    As of 2023. The UDTPA also prohibits "unfair or unconscionable acts or practices." 2023 Minn. Laws. ch. 57, art. IV, § 6.

155.    Defendants violated and are violating the UDTPA through their control and operation of business entities identified herein that represent (expressly or by implication) that consumers have a legal obligation to repay loan amounts that in fact did not exist

because the loans are void *ab initio* under Minnesota law. Defendants, through their control and operation of the business entities identified herein, have marketed their loans as legal credit products, sent correspondence to Minnesota consumers demanding payment, originated ACH debit entries from consumer bank accounts, conducted debt collection on Minnesota consumers, and demand repayment on defaulted loans. These practices are misleading and unfair.

156.    Defendants also failed to disclose that consumers had no legal obligation to pay the loan amounts because they were void under state law. Consumers were and are unlikely to know that U.S. Supreme Court precedent and Minnesota laws render Defendants' loans void or limited consumers' obligation to repay.

157.    Representations concerning the legal obligation of the consumer to repay or not repay are material terms or conditions meant to induce the borrower to believe the loans are legal, to induce consumers to make payments they are not obligated to make, and to prevent consumers from asserting rights under Minnesota law.

158.    The Attorney General is authorized to bring civil actions to enforce the UDTPA under section 325D.45, section 8.31, and *parens patriae* authority.

159.    Defendants are liable for these violations in their official capacity in management and control of the IMDG, Bright Lending, Target Cash Now, and Green Trust Lending. They decided, adopted, or ratified the policies of the IMDG, Bright Lending, Target Cash Now, and Green Trust Lending related to the unlawful lending operations and deception outlined herein. They also conspired and agreed with the entities described

herein to make the illegal loans and misrepresentations to Minnesota consumers and extract illegal payments from individuals in Minnesota.

160.    These violations are ongoing: Defendants continue to market and sell new consumer loans to consumers in Minnesota and demand repayment and engage in debt collection on loans subject to these violations. Minnesota and its residents have been and continue to be harmed by Defendants' violations of the UDTPA.

161.    Because the business entities controlled by Defendants and identified herein are owned by federal recognized Indian tribes and subject to sovereign immunity, the Attorney General brings this action for declaratory and injunctive relief only—in order to secure effective prospective relief to stop continuing and future violations of the law.

**COUNT VIII**
**False Statement in Advertising**
**Minn. Stat. §§ 325F.67**

162.    The Attorney General incorporates by reference paragraphs 1 through 86 of this Complaint.

163.    Minn. Stat. § 325F.67 (the False Statement in Advertising Act or "FSAA") states that "any person [or] corporation" who has "intent to sell … [a] service[] or anything offered by such person … to the public … for sale … or to induce the public in any manner to enter into any obligation relating thereto" and "makes, publishes, disseminates, circulates, or places before the public .. in this state" and "in a … publication, … letter, … or in any other way, an advertisement of any sort regarding [the] service … for use,

consumption, purchase, or sale" is liable if the "advertisement contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading."

164.   Section 325F.67 further provides that a violation is a misdemeanor and "any such act is declared to be a public nuisance and may be enjoined as such." It states that a "duty of strict observance and enforcement of this law and prosecution for any violation thereof is hereby expressly imposed upon the attorney general."

165.   Defendants' loans and credit products are "merchandise, … [a] service, or anything offered … directly or indirectly, to the public" within the meaning of the statute. Defendants are "persons" or "corporations" within the meaning of the statute.

166.   Defendants violated and are violating the FSAA through their control and operation of business entities identified herein that falsely represent (expressly or by implication) and market their loans as legal credit products and fail to disclose that consumers have no legal obligation to pay the loan amounts because they are void under state law. Consumers were and are unlikely to know that U.S. Supreme Court precedent and Minnesota laws render Defendants' loans void or limited consumers' obligation to repay.

167.   The Minnesota Attorney General is authorized to bring civil actions to enforce the FSAA under the statute, section 8.31, and his *parens patriae* authority.

168.   Defendants are liable for these violations in their official capacity in management and control of the IMDG, Bright Lending, Target Cash Now, and Green Trust Lending. They decided, adopted, or ratified the policies of the IMDG, Bright Lending,

Target Cash Now, and Green Trust Lending related to the unlawful lending operations and deception outlined herein. They also conspired and agreed with the entities described herein to make the illegal loans and misrepresentations to Minnesota consumers and extract illegal payments from individuals in Minnesota.

169.    These violations are ongoing: Defendants continue to market and sell new consumer loans to consumers in Minnesota. Minnesota and its residents have been and continue to be harmed by Defendants' violations of the FSAA.

170.    Because the business entities controlled by Defendants and identified herein are owned by federal recognized Indian tribes and subject to sovereign immunity, the Attorney General brings this action for declaratory and injunctive relief only—in order to secure effective prospective relief to stop continuing and future violations of the law.

## PRAYER FOR RELIEF

The Attorney General respectfully requests that this Court enter an order granting the following relief:

1.    Declaring, pursuant to Fed. R. Civ. P. 57, that Defendants' marketing, offering, issuing, servicing, collection, and providing of loans with usurious interest rates in Minnesota, through their operation of the IMDG, Bright Lending, Target Cash Now, and Green Trust Cash is in violation of the above federal and state laws;

2.    Enjoining, pursuant to Fed. R. Civ. P. 65 and/or the above-identified federal and Minnesota statutes, Defendants, any other officers, agents, servants, employees, and attorneys of Defendants' and the corporations they control and manage; and any other

persons in active concert or participation with them and with notice of an injunctive order from marketing, offering, issuing, servicing, collecting on, or otherwise providing usurious and illegal loans in Minnesota;

3.      Subject to requirements and conditions under 12 U.S.C. § 5497(d) and 12 C.F.R. Part 1075, ordering declaratory or other relief as is necessary to allow victims of Defendants' violations of the CFPA to receive compensation from the victim relief fund, including an order that civil penalties described under section 5497 are or would be awarded in this action but for the sovereign immunity afforded Defendants against monetary damages; and

4.      Granting such further relief as provided by law or as the Court deems appropriate and just.

Dated: Oct. 30, 2023                                    Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota

JESSICA WHITNEY
Deputy Attorney General

JASON PLEGGENKUHLE
Assistant Attorney General


*/s/ Adam Welle*
_____
ADAM WELLE
Assistant Attorney General
MN Atty. Reg. No. 0389951

BENNETT HARTZ
Assistant Attorney General

MN Atty. Reg. No. 0393136

adam.welle@ag.state.mn.us
bennett.hartz@ag.state.mn.us
445 Minnesota Street, Suite 1200
St. Paul, Minnesota 55101-2130
(651) 757-1425

*Attorneys for the State of Minnesota*